UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH CAROLINA
CHARLESTON DIVISION

| | | |
|---|---|---|
| Briana Bethea, individually and on behalf of all others similarly situated; | ). | CASE No.: 2:22-cv-2790-BHH-MHC |
| Plaintiff, | ) ) ) ) | **CLASS AND COLLECTIVE ACTION COMPLAINT** |
| v. | ) ) | |
| First Citizens Corporation; First Citizens Bank & Trust Company; First Citizens BancShares, Inc., Jason Maurer, individually; Eric Crain, individually, and Reeves Skeen, individually, | ) ) ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) ) | |

## COMPLAINT

As and for her Complaint, Plaintiff Briana Bethea, on behalf of herself and all others similarly situated, states and alleges the following against Defendants First Citizens Corporation, First Citizens Bank & Trust Company, First Citizens BancShares, Inc. (collectively herein, "First Citizens" or the "Bank"), Jason Maurer (individually herein, "Maurer"), Eric Craine (individually herein, "Craine") and Reeves Skeen (individually herein, "Skeen") (collectively herein, "Defendants"):

## NATURE OF THE ACTION

1. Upon information and belief, First Citizens is one of the largest banks in United States. In 2011, the United States Department of Housing and Urban Development ("HUD") HUD filed a complaint against the Bank alleging that it had denied mortgage loans to Black, Latino and Asian applicants at a disproportionately higher rate than white

applicants. HUD filed this complaint based on its review of 2010 Home Mortgage Disclosure Act data submitted by First Citizens to HUD. In 2016, after a lengthy HUD investigation, the Bank agreed to a settlement requiring that it take several actions, including but not limited to refraining from discriminatory consideration of race or national origin in marketing, picking sites for branches and services, and defining minority-lending areas under the federal Community Reinvestment Act; and requiring all employees and agents involved in underwriting to attend training in fair lending practices.[1]

2. Despite facing federal scrutiny and reaching a settlement on its discriminatory lending practices, however, the Bank failed to address and remedy its internal discriminatory employment practices.

3. As detailed in this Complaint, the Bank's outward discriminatory lending practices mirrored its internal discriminatory patterns and practices toward its Black and minority employees, to whom it subjected disparate treatment, a racially hostile work environment, and denied promotions.

4. Moreover, First Citizens' discriminatory employment practices extended beyond race or national origin, as it adopted an anachronistic and misogynist pattern and practice of denying its female employees equal pay relative to their (often white) male counterparts.

---

[1] https://archives.hud.gov/news/2016/pr16-086.cfm

5. This action seeks declaratory, injunctive and equitable relief, as well as monetary damages, to redress Defendants' unlawful employment practices, including unlawful discrimination, against Plaintiff in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"); Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); and the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA").

6. As set forth below, Plaintiff (individually and as class representative of the putative classes) and classes of similarly situated Black and/or female current and former employees of First Citizens are victims of discriminatory barriers to equal opportunity advancement, which has included the unlawful denial of promotions, compensation commensurate with white male employees, and equality with respect to the terms and conditions of their employment, including, in many cases, the wrongful termination of such employment.

7. First Citizens' compensation, assignment and promotion policies, practices and/or procedures incorporate the following discriminatory practices: (a) failing to compensate Black and/or female employees commensurate with similarly situated white and/or male employees; (b) failing to promote Black and/or female employees at the same rate and on the same terms and conditions as similarly situated white and/or male employees; (c) relying on subjective judgments, procedures and criteria which permit and encourage the incorporation of racial- and/or gender-based stereotypes and bias by the First Citizens' predominantly White managerial and supervisory staff in making compensation, assignment, and termination decisions; and (d) generally

refusing to provide equal terms and conditions of employment for Black, and/or female employees.

## ADMINISTRATIVE PROCEDURES

8.  Plaintiff timely filed a charge against Defendant with the federal Equal Employment Opportunity Commission based on the discrimination she suffered and received a Notice of Right to Sue on or around May 21, 2022.[2]

9.  As such, Plaintiff has exhausted her administrative remedies.

10. Upon notice to Title VII class members, as defined herein, each will file a Charge of Discrimination with the Equal Employment Opportunity Commission, after which this Complaint will be amended.

11. Any and all other prerequisites to the filing of this suit have been met.

## JURISDICTION AND VENUE

12. The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331, as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VI; Section 1981; and the EPA.

13. The Court has supplemental jurisdiction over Plaintiff's related claims arising under State and local law pursuant to 28 U.S.C. § 1367(a).

---

[2] Plaintiff proceeded *pro se* in filing her Charge of Discrimination, and the EEOC prepared her Charge based on a short interview with Plaintiff.

14. Pursuant to 28 U.S.C. § 1391 and 29 U.S.C. § 1132(e), venue is proper in this district because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

## **PARTIES**

15. Plaintiff Briana Bethea is a Black female former employee of First Citizens, and has been employed at First Citizens from high school, through college and thereafter, a total of over fourteen (14) years. She is a resident of Berkeley County, State of South Carolina, and at all relevant times met the definition of an "employee" or "eligible employee" under all applicable statutes.

16. Upon information and belief, Defendant First Citizens Corporation is a corporation incorporated under the laws of South Carolina, with bank branches across the State of South Carolina. At all relevant times, Defendant First Citizens Corporation met the definition of an "employer" under all relevant statutes.

17. Upon information and belief, Defendant First Citizens Bank & Trust Company is a corporation incorporated under the laws of North Carolina, with bank branches across the State of South Carolina. At all relevant times, Defendant First Citizens Bank & Trust Company met the definition of an "employer" under all relevant statutes.

18. Upon information and belief, Defendant First Citizens BancShares, Inc. is a corporation incorporated under the laws of Delaware, with bank branches across the State of South Carolina. At all relevant times, Defendant First Citizens BancShares, Inc. met the definition of an "employer" under all relevant statutes

19. Upon information and belief, Defendant Jason Maurer, who is white and the Bank's "Manager of Retail Banking," is a resident and citizen of the State of South Carolina, residing in Charleston County. At all relevant times, as Manager of Banking exercising authority over compensation, hiring and promotional decisions, Maurer met the definition of an "employer" under Section 1981 and the EPA.

20. Upon information and belief, Defendant Eric Craine, who is white and the Bank's "Senior Vice President and Manager of Retail Banking," is a resident and citizen of the State of South Carolina, residing in Charleston County. At all relevant times, as Senior Vice President and Manager of Retail Banking exercising authority over compensation, hiring and promotional decisions, Maurer met the definition of an "employer" under Section 1981 and the EPA.

21. Upon information and belief, Defendant Skeen, who is white and the Bank's "Area Executive," is a resident and citizen of the State of South Carolina, residing in Charleston County. At all relevant times, as Area Executive exercising authority over compensation, hiring and promotional decisions, Skeen met the definition of an "employer" under and Section 1981 and the EPA.

## JOINT EMPLOYER ALLEGATIONS

22. Either formally or as a matter of practice, Defendants First Citizens Corporation, First Citizens Bank & Trust Company, First Citizens BancShares, Inc. collectively determine, share or allocate the power to direct, control or supervise Plaintiff and all others similarly situated. For example, Defendants First Citizens Corporation, First Citizens Bank & Trust Company, First Citizens BancShares, Inc. state the following in

the Introduction to the First Citizens' Human Resources Policies & Standards Manual ("Manual"):

> First Citizens BancShares, Inc. ("BancShares") is a Delaware corporation registered as a financial holding company. BancShares has various subsidiaries operating in several states across the country including First Citizens Bank & Trust Company; First Citizens Investor Services, Inc.; Neuse, Incorporated; and Neuse Title Services, Inc. For ease of reference, the terms, "First Citizens," "the Bank," "the company," and similar terms used throughout this Human Resources Policies and Standards Manual ("Manual") refer to BancShares, [sic] any of its direct or indirect subsidiaries.

23. Either formally or as a matter of practice, Defendants First Citizens Corporation, First Citizens Bank & Trust Company, First Citizens BancShares, Inc. collectively determine, share or allocate the power to directly or indirectly hire or fire the workers or modify the terms or conditions of the workers' employment.

24. Upon information and belief, Defendants First Citizens Corporation, First Citizens Bank & Trust Company, First Citizens BancShares, Inc. have developed a close business relationship with each other over years.

25. Either formally or as a matter of practice, Defendants First Citizens Corporation, First Citizens Bank & Trust Company, First Citizens BancShares, Inc. collectively determine, share or allocate responsibility over the functions ordinarily carried out by an employer.

26. For the reasons set forth above, Defendants First Citizens Corporation, First Citizens Bank & Trust Company, First Citizens BancShares, Inc. are the "joint employers" of Plaintiff and the putative and collective class members.

27. At all times relevant to this Complaint, Defendant Jason Maurer, who is white and the Bank's "Manager of Retail Banking," exercised a high level of control over the Section 1981 and EPA violations herein, including but not limited to exercising authority over compensation, hiring and promotional decisions with respect to Plaintiff and all those similarly situated. As such, Defendant Mauer was a "co-employer" of Plaintiff and all others similarly situated for purposes of Section 1981 and the EPA.

28. At all times relevant to this Complaint, Defendant Eric Craine, who is white and the Bank's "Senior Vice President and Manager of Retail Banking," exercised a high level of control over the Section 1981 and EPA violations herein, including but not limited to exercising authority over compensation, hiring and promotional decisions with respect to Plaintiff and all those similarly situated. As such, Defendant Craine was a "co-employer" of Plaintiff and all others similarly situated for purposes of Section 1981 and the EPA.

29. At all times relevant to this Complaint, Defendant Skeen, who is white and the Bank's "Area Executive," is a resident and citizen of the State of South Carolina, exercised a high level of control over the Section 1981 and EPA violations herein, including but not limited to exercising authority over compensation, hiring and promotional decisions with respect to Plaintiff and all those similarly situated. As such, Defendant Craine was a "co-employer" of Plaintiff and all others similarly situated for purposes of Section 1981 and the EPA.

## FACTUAL ALLEGATIONS

30. On the first page of the Manual, First Citizens purports to "honor and celebrate" its employees' "diversity."

31. In the Manual, the portions of which have been cited in this Complaint are attached hereto as **Exhibit A,** First Citizens purports to have a policy of equal employment opportunity and an Affirmative Action Program, stating:

> **The Bank has long pursued a policy of employment opportunity and affirmative action, which work together to foster inclusion and diversity of our associates.** The Bank feels strongly that employment opportunity is not only a legal and economic necessity, but essential to ensure all associated have equal access to resources enabling them to reach their full potential. Our Affirmative Action Program evaluates our employment practices and establishes diversity goals to measure our success toward achieving that result.

> […]

> The Bank hires well-qualified people to perform the many tasks necessary in providing high quality products and services at a reasonable cost. An integral part of this Policy is to **provide equal employment opportunity for all persons** by administering recruitment, hiring, training, **promotion**, **compensation**, benefits and privileges of employment, **appointments for advancement (including upgrading and promotion)**, transfers, relocations, social and recreation programs, and terminations of employment (including layoffs and recalls) for all associated **without discrimination because of race** (include traits historically associated with race, such as hair texture and protective hairstyles), color, religion, national origin, **sex**, age, disability, protected veteran status, sexual orientation, gender identity, genetic information, military membership, application, or obligation, or any other legally protected status.

> […]

> To accomplish these aims, specific accountabilities have been established for carrying out the Bank's Equal Employment Opportunity ("EEO") and Affirmative Action Policy and Affirmative Action Program stated herein. The Chief Human Resources Officer has the overall responsibility for the

administration of the Bank's Affirmative Action Program and enforcement of the EEO Policy, Management of the Bank will be held accountable for achieving the placement goals set further for their areas.

A detailed system to audit, report, and monitor the achievements attainment set forth in the Bank's Affirmative Action Program has been established and results will be reported to the Chief Human Resources Officer and managers (signatories) responsible for each affirmative action plan of the Bank on at least an annual basis. The Bank and its management intend to further the principles of affirmative action and equal opportunity so full utilization of our minority and female workforce may be achieved, and so the skills offered by qualified individuals with disabilities and protected veterans in the workforce are maximized within the Bank.

**Every management level associate of the Bank is responsible for encouraging and increasing employment opportunities for minorities, females,** individuals with disabilities and protected veterans in the workforce are maximized within the Bank.

**Every management level associate of the Bank is responsible for encouraging and increasing employment opportunities for minorities, females, individuals with disabilities, and protected veterans in the workforce and maintaining an atmosphere conducive to a civil and professional workplace through practices and person example. All management staff shall take an active and/or supportive role in both the planning and implementation of the Bank's Affirmative Action Program and enforcing the Bank's EEOC Policy.**

Exhibit A at 8-10, emphasis added.

32. On the "About Us" page[3] of its website, First Citizens purports to be "focused on inclusion, equity and diversity" and committed to "embracing diversity, disavowing discrimination and advancing our inclusion, equity and diversity efforts."

---

[3] https://www.firstcitizens.com/about-us/inclusion-equity-diversity#:~:text=Leaders%20are%20committed%20to%20embracing,the%20needs%20of%20the%20bank.

33. However, diversity has been subverted at every turn throughout First Citizens' workforce.

34. Plaintiff began working for the Bank immediately after high school in 2007 as a part-time teller at the Bank's branches in Dillon, Marlboro, and Marion Counties in South Carolina. Plaintiff continued working as a teller at the Bank's Charleston County branches while she attended the College of Charleston from August 2007 to May 2012, and by 2012 was a full-time teller with the Bank. After graduating college, Plaintiff worked for the Bank as a "Floating Bank Teller" ("Floater") which meant that she floated from branch to branch, depending on the needs of the branches.

35. Over the course of her employment with First Citizens, Plaintiff worked at numerous Bank branch locations in South Carolina, including but not limited to: the Downtown Charleston Main Branch; the Marion Square Branch (now closed); the East Bay Branch; the Mount Pleasant Johnnie Dodds Branch; Mount Pleasant 17N Branch; the Folly Rd. Branch; the West Ashley Branch; the Hollywood Branch; the Summerville Main Branch; the Summerville Oakbrook Branch; the Summerville I-26 Branch; the Hanahan Branch; the Ashley Phosphate Branch; the Trident Branch (now closed); the Bennettsville Branch; the Clio Branch; the Dillon branch; the Marion branch; the Mullins branch; the Lake View branch; the South of the Border branch (now closed).

36. In her over fourteen (14) years as an employee of First Citizens, by virtue of her tenure and floating in numerous different Bank branches across South Carolina, Plaintiff observed widespread discriminatory employment practices based on race and gender across these First Citizens branches.

37. Upon information and belief, out of the roughly 1,000 Bank employees she worked with over her 14-year-plus tenure in the Charleston area, Plaintiff estimates that only about 15 (fifteen) Bank employees were men of color.

38. Upon information and belief, at First Citizens, **none** of the roughly 17 (seventeen) managers at South Carolina branches are Black.

39. The lack of Black or minority leadership fosters an atmosphere where stereotypes and biases are condoned and perpetuated, creating disparate and racially hostile working conditions for Black and minority employees.

40. For example, racist Bank customers were permitted to threaten Black employees without rebuke from management. In one instance, after being asked for his identification, a white customer at the drive-through teller service handed Plaintiff his Concealed Weapons Permit and then pointed to his glovebox and asked Plaintiff if she knew what was in there in a threatening manner.

41. The other Black tellers in the window witnessed this event, and shared Plaintiff's understanding of this as a racially-motivated threat, and also shared her fear of this customer after this incident.

42. The team who experienced this threat reported this incident to Skeen and the Bank's Human Resources department.

43. Human Resources instructed Skeen to cancel the customer's bank account, but Skeen refused, and this potentially dangerous customer was permitted to continue banking with First Citizens.

44. However, when a Black customer had threatened Plaintiff in an earlier instance, Skeen canceled that customer's account immediately.

45. In another instance, a white Bank customer continued to make racially coded comments about a Black male employee's dreadlocks, and called Plaintiff "fella," stating that she "looked like that other fella over there" who, like Plaintiff, had dreadlocks. This customer also stated further to the Black male employee that "if you're a fella, you should cut your hair."

46. This same Bank customer was permitted by Bank management to make numerous unwelcome discriminatory comments to Black, minority and female staff over nearly a decade, including but not limited to:

- He came into the Bank with two bags of "cricket snacks," and then told the Black female employees that they should eat them;

- He told a Black female employee that Juneteenth, a day celebrating and commemorating Black citizens' emancipation from slavery, was "no big deal" and that only the Fourth of July should be celebrated;

- He singled out and harassed Black Bank employees about not voting for Democrats because Democrats "had done nothing for them;" and, among numerous other incidents,

- He singled out Hispanic and Latinx employees to tell them President Trump's wall needed to be erected to keep Mexicans out of the country.

47. Bank employees were not permitted to engage with customers in a confrontational manner, as such they were forced to endure **years** of this demeaning treatment, the severeness and pervasiveness of which caused them extreme anxiety, humiliation, frustration, and sadness, and otherwise affected the conditions of their employment.

48. Multiple employees, including Plaintiff, complained to Human Resources, Mauer, Craine, and Skeen about this customer's pervasive unwelcome conduct and, as such, a conference call with Human Resources, Maurer and other management was held regarding the customer's unwelcome, discriminatory and hostile behavior toward Black and minority Bank employees. The Human Resources representative told Mauer that he needed to have a conversation with the customer about his behavior, and that if the behavior continued his account should be closed.

49. Despite this conference call, the customer's objectively racially and misogynistically hostile behavior continues to this day, which has been brought to Mauer's attention on multiple occasions since the conference call, but Mauer has to date refused to remedy the situation or closing the customer's account.

50. Defendants further showed their animus toward Black employees when they held a "celebration" for the Charleston-area employees at a former slave plantation, Mcleod Plantation on James Island and, curiously, failed to add Charleston-area Floaters, the majority of whom are Black and minorities, to the email invitation list.

51. Plaintiff and her coworkers made numerous protected complaints to Human Resources about the racially hostile work environment created by threatening and racist Bank customers. For example:

- On November 12, 2020, Plaintiff emailed Justin Welch (Branch Manager) and Cara Earhart (Branch Operations Manager) and complained about the customer who had threatened her with a gun in his glovebox;

- In the summer of 2016, Plaintiff emailed Mauer and complained about the racist customer referenced in Paragraphs 45-47 herein, but Maurer's "solution" was to banish the customer to the drive thru where he continues to this day to make these comments, and continues to come into the branch now even after additional complaints by employees;

- In August 2017, a white female employee told Plaintiff about a customer who came into the Folly Rd. branch making racist remarks about Black people. She complained to management, and nothing was done with regard to the customer's account, thus the employee resigned;

- Around the time of George Floyd's murder, on or around June 1, 2020, Plaintiff was accused by a white customer of not assisting the customer because she was in the company of a police officer (apparently the customer's fiancé). There was no basis to this complaint beside that Plaintiff is Black. Plaintiff spoke with Maurer on June 3, 2020 about this incident, and asked Maurer to speak with the customer to explain that Plaintiff was making calls as instructed by upper management at the time she came in, but Mauer refused to do so.

52. Despite numerous complaints regarding the above and other instances of severe and pervasive unwelcome discriminatory conduct based on race that was negatively

affecting Black and minority employees' conditions of employment in significant ways, Defendants took no remedial action to remedy the racially hostile work environment.

53. The Bank's lack of Black, minority, or female leadership also fosters an atmosphere where Black, minority and female employees are denied advancement in their employment with the Bank at alarming rates compared to similarly situated white male Bank employees.

54. For example, upon information and belief, white men drastically outnumber Black and minority women and men at the area-management level.

55. Further, Plaintiff and other Black female Bank employees were paid far less than white male Bank employees for equal work on jobs requiring equal skill, effort, and responsibility, which were performed under similar work conditions.

56. In each of her varying roles as a Teller, Floater, and Financial Services and Sales Representative, Plaintiff was paid at a lower hourly rate than white male Tellers, Floaters, and Financial Service & Sales Representatives, including but not limited to being paid $15.50 per hour as a Senior Sales & Services Representative, while a white male with less tenure at the Bank told her he was being compensated at $17.00 an hour.

57. Plaintiff discussed the pay disparity between Black and minority female employees and white male employees with her Black female coworkers, and several of these coworkers expressed similar concerns regarding this pay disparity for equal work on jobs requiring equal skill, effort, and responsibility, which they performed under similar work conditions as their male counterparts.

58. Defendants had no seniority system, no merit system, no system that measures earnings by quantity or quality of production, nor indeed any bona fide factor other than sex such as education, training, or experience as a basis for their compensation decisions.

59. Upon information and belief, Maurer, Craine and Skeen were directly involved in the decision to pay Black and minority female Bank Tellers, Floaters, and Financial Service & Sales Representatives less than their white counterparts in equal or substantially similar positions.

60. Plaintiff and her Black and minority female coworkers further observed that white employees were regularly moved laterally and promoted, often to positions that were not posted. For example:

- Two white males from within the Bank were promoted to Business Development Officers by Maurer, Craine, and Skeen without posting the positions;

- White males from within the Bank were promoted to Financial Services Representative by Craine and Skeen at the Folly Road branch, Charleston Main branch, and West Ashley branch without posting the positions; and

- White males from within the Bank were promoted to Financial Services Specialist at the Summerville Oakbrook branch by Mauer, without posting the positions.

61. Had Plaintiff or her Black, minority and/or female coworkers been aware of these open positions, they likely would have applied for same, but were never given the opportunity.

62. The fact that Defendants did not post these positions had the effect of freezing out qualified Black, minority and/or female from these higher-paying positions.

63. Upon information and belief, Maurer, Craine and Skeen were directly involved in the intentional freezing out of these employees.

64. Plaintiff and her Black, minority and/or female coworkers made numerous protected complaints of this pattern and practice of racial and gender discrimination in compensation and promotions to Human Resources, Maurer, Craine and Skeen, including complaints of wage disparities between Black, minority and white employees, but no remedial action was taken to stem the discrimination.

65. After one such complaint made by Plaintiff to Human Resources in 2020 regarding the Bank's failure to promote her, the Human Resources representative admitted that First Citizens had "a problem with diversity."

66. Defendants ignored Plaintiff's and her coworkers' complaints about the discriminatory compensation and promotional opportunities, despite First Citizens' own Human Resources Department conceding that the Bank has "a problem with diversity," and instead of remedying the widespread discrimination, allowed it to continue.

67. Despite the widespread discrimination alleged against First Citizens under their watch, Maurer and Skeen were both rewarded with promotions: Maurer was promoted from Branch Manager to Manager of Regional Banking after one year, and Skeen was promoted to Area Executive.

## RACE CLASS ACTION ALLEGATIONS
**(Racial Discrimination in Violation of Title VII against First Citizens, and Section 1981 against all Defendants)**

68. The First and Second Causes of Action are being prosecuted as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23.

69. Plaintiff incorporates by reference the allegations from the preceding paragraphs of this Class and Collective Action Complaint alleging common patterns, practices and/or policies resulting in discrimination against Black employees.

70. The race-based discrimination against Black and minority employees fostered by the Bank's patterns, practices and/or policies include, but are not limited to: (i) creating a racially hostile work environment for Black and minority employees, including Plaintiff, by allowing customers to humiliate, threaten and demean them for over a decade based on their race (allegations which are continuing in nature); (ii) paying Black and minority employees, including Plaintiff, less than similarly situated white employees; (iii) failing to promote Black and minority employees, including Plaintiff, in favor of similarly or less-qualified or less-tenured white employees; and (iv) failing to prevent, address, properly investigate, and/or take remedial action regarding discrimination against Black and minority employees.

**Class Definition**

71. Plaintiff seeks to maintain claims on her own behalf and on behalf of a class of Black and minority employees who have been, are now or will be employed by the Bank in its South Carolina branches as Tellers, Floaters, and Financial Services and Sales Representatives who were subjected to unwelcome racist and/or threatening white Bank

customers, and/or were denied promotions or access to promotional job openings, and/or who were paid less than similarly-situated white employees, at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Race Class" or the "Race Class Members"). This Class, upon information and belief, consists of at least 100 individuals.

72. Plaintiff and the proposed Race Class have standing to seek such relief because of the adverse effects that Defendants' intentional unlawful patterns, practices and/or policies described herein have had on them individually and generally.

73. The intentional patterns, practices and/or policies described in this Complaint demonstrate that such discrimination as described herein is not an unusual practice for Defendants; rather, disparate treatment and discrimination are part and parcel of their standard operating patterns, practices and/or policies.

74. But for Defendants' racial animus against Plaintiff's and the Race Class Members' race, Plaintiff and the Race Class Members would have enjoyed the same terms and conditions as their similarly situated white counterparts.

**Numerosity and Impracticality of Joinder**

75. The Race Class Members are sufficiently numerous to make joinder of all of them impracticable. While the exact number of Race Class Members is unknown because such information is in the exclusive control of Defendants, upon information and belief there are at least 100 current and former Black or minority employees who have been the victim of the discriminatory conduct by Defendants described herein, in violation of federal law, because they are not white.

76. Although the number of Race Class Members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

**Common Questions of Law and Fact**

77. The claims alleged on behalf of the Race Class raise questions of law and fact common to the Class. Chief among these questions is whether Defendants: (i) had patterns, practices and/or policies fostering and resulting in systemic unlawful discrimination against Black and minority employees in their terms and conditions of employment (including racially hostile customers, compensation, promotions, and access to promotions); and (ii) engaged in a systemic pattern or practice of race-based discrimination or disparate impact discrimination against Black Tellers, Floaters, and Financial Services and Sales Representatives, in their terms and conditions of employment.

78. Thus, the common question requirement of FRCP 23(a) is satisfied.

**Typicality of Claims and Relief Sought**

79. Plaintiff (the "Race Class Representative") is a Member of the Class she seeks to represent. The claims of the Class Representative of Black and minority Employees are typical of the claims of the proposed Race Class in that they all arise from the same unlawful patterns, practices and/or policies of Defendants, and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal law. The Race Class Representative and the Race Class Members all allege that they each were the victim of unlawful discrimination in the form of unwelcome racist and/or threatening white Bank customers, were denied promotions or access to

promotional job openings, and/or were paid less than similarly situated white employees solely because they are Black Tellers, Floaters, and Financial Services and Sales Representatives. The relief Plaintiff seeks for Defendants' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Race Class Members.

80. Sadly, the discrimination experienced by the Race Class Representative is typical of the disparate treatment faced by Defendants' Black Tellers, Floaters, and Financial Services and Sales Representatives.

81. Thus, the typicality requirement of FRCP 23(a) is satisfied.

**Adequacy of Representation**

82. The interests of the Race Class Representative is co-extensive with those of the Race Class Members who she seeks to represent in the instant case. The Race Class Representative is willing and able to represent the proposed Race Class fairly and vigorously as she pursues her similar individual claims. The Race Class Representative has retained counsel who are qualified and experienced in employment class action litigation, and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

83. The combined interests, experience and resources of the Race Class Representative and her counsel to competently litigate the individual and Race Class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

**Requirements of Rule 23(b)(1)**

84. Without Class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Specifically, all evidence of Defendants' patterns, practices and/or policies and the issue of whether they are in violation of federal law would be exchanged and litigated repeatedly. Accordingly, certification of the proposed Race Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiff, the Race Class and Defendants.

85. By filing this Class and Collective Action Complaint, Plaintiff is preserving the rights of Race Class Members with respect to the statute of limitations on their claims. Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**Requirements of Rule 23(b)(2)**

86. Defendants acted on grounds, described herein, generally applicable to Plaintiff and the Race Class Members, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward Black Bank Tellers, and Financial Services & Sales Representatives. These discriminatory acts are fostered by Defendants' standard patterns, practices and/or policies. They are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiff and the Race Class as a whole.

87. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against Black Tellers, and Financial Services & Sales Representatives based on their race.

88. Declaratory and injunctive relief are the factual and legal predicates for Plaintiff's and the Race Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

89. Accordingly, injunctive and declaratory relief is among the predominant forms of relief sought in this case.

**Requirements of Rule 23(b)(3)**

90. The common issues of fact and law affecting the Race Class Representative's claims and those of the Race Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

91. A class action is superior to other available means for the fair and efficient adjudication of Plaintiffs' claims and the claims of the proposed Race Class.

92. The cost of proving Defendants' pattern and practice of discrimination makes it impractical for the members of the Race Class to pursue their claims individually.

93. The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all Race Class Members (they must have worked or be working for Defendants as Tellers, and Financial Services & Sales

Representatives in South Carolina branch locations), as well as the common questions of law and fact described above.

## GENDER CLASS ACTION ALLEGATIONS
### (Gender Discrimination in violation of Title VII against First Citizens)

94. The Third Cause of Action is being prosecuted as a class action pursuant to Federal Rule of Civil Procedure ("FRCP") 23.

95. Plaintiff ("Gender Class Representative") incorporates by reference the allegations from the preceding paragraphs of this Class and Collective Action Complaint alleging common patterns, practices and/or policies resulting in discrimination against female Bank Tellers, and Financial Services & Sales Representatives.

96. The gender-based discrimination against female employees fostered by Bank patterns, practices and/or policies include, but are not limited to: (1) paying female employees, including Plaintiff, less than similarly situated male employees; (2) failing to promote female employees, including Plaintiff, in favor of similarly or less-qualified male employees; (3) failure to prevent, address, properly investigate, and/or take remedial action regarding discrimination against female employees; and (4) failing to prevent, address, properly investigate, and/or take remedial action regarding discrimination against female employees.

**Class Definition**

97. Plaintiff seeks to maintain claims on her own behalf and on behalf of a class of female employees who have been, are now or will be employed by the Bank as Tellers, and Financial Services & Sales Representatives in South Carolina branch locations at any

25

time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "Gender Class" or "Gender Class Members"). This Gender Class, upon information and belief, consists of at least 50 individuals.

98. Plaintiff and the proposed Gender Class have standing to seek such relief because of the adverse effects that First Citizens' unlawful patterns, practices and/or policies have had on them individually and generally.

99. The patterns, practices and/or policies described in this Complaint demonstrate that discrimination is not unusual for First Citizens; rather, such unlawful is part and parcel of its standard operating patterns, practices and/or policies.

**Numerosity and Impracticality of Joinder**

100. The Gender Class Members are sufficiently numerous to make joinder of all of them impractical. While the exact number of Gender Class Members is unknown because such information is in the exclusive control of First Citizens, upon information and belief, there are at least 50 current and former female employees who have been the victim of discriminatory conduct and adverse employment actions by the Bank, in violation of federal law, because they are female.

101. Although the number of Gender Class Members is incapable of precise determination at this time, it is significant and satisfies the numerosity requirement of FRCP 23(a).

**Common Questions of Law and Fact**

102. The claims alleged on behalf of the Gender Class Representatives raise questions of law and fact common to the Class. Chief among these questions is whether First

Citizens: (1) had patterns, practices and/or policies fostering and resulting in systemic unlawful discrimination against female employees in their terms and conditions of employment; and (2) engaged in a systemic pattern or practice of gender-based discrimination or disparate impact discrimination against female Tellers, Floaters and Financial Services & Sales Representatives in their terms and conditions of employment.

103. Thus, the common question requirement of FRCP 23(a) is satisfied.

**Typicality of Claims and Relief Sought**

104. Gender Class Representative is a Member of the Class she seeks to represent. The claims of the Gender Class Representative is typical of the claims of the proposed Gender Class in that they all arise from the same unlawful patterns, practices and/or policies of First Citizens, and are based on the legal theory that these patterns, practices and/or policies violate legal rights protected by federal law. The Gender Class Representative and the Gender Class Members each allege that they each were the victim of unlawful discrimination by First Citizens because they are female Tellers, Floaters and Financial Services & Sales Representatives. The relief Plaintiff seeks for First Citizens' unlawful patterns, practices and/or policies is typical of the relief which is sought on behalf of the Class Members. The discrimination experienced by the Gender Class Representatives was sadly typical of the disparate treatment faced by First Citizens' female Tellers, Floaters and Financial Services & Sales Representatives.

105. Thus, the typicality requirement of FRCP 23(a) is satisfied.

**Adequacy of Representation**

106.   The interests of the Gender Class Representative is co-extensive with those of the Gender Class Members she seeks to represent in the instant case. The Gender Class Representative is willing and able to represent the proposed Gender Class fairly and vigorously as she pursues her similar individual claims. The Gender Class Representative has retained counsel who are qualified and experienced in employment class action litigation, and who are able to meet the time and fiscal demands necessary to litigate a class action of this size and complexity.

107.   The combined interests, experience and resources of the Gender Class Representative and her counsel to competently litigate the individual and Gender Class claims at issue in the instant case satisfy the adequacy of representation requirement of FRCP 23(a).

**Requirements of Rule 23(b)(1)**

108.   Without Class certification, the same evidence and issues would be subject to re-litigation in a multitude of individual lawsuits with an attendant risk of inconsistent adjudications and conflicting obligations. Specifically, all evidence of First Citizens' patterns, practices and/or policies, and the issue of whether they are in violation of federal, state and local law would be exchanged and litigated repeatedly. Accordingly, certification of the proposed Gender Class is the most efficient and judicious means of presenting the evidence and arguments necessary to resolve such questions for Plaintiffs, the Gender Class and First Citizens.

109. By filing this Class and Collective Action Complaint, Plaintiff is preserving the rights of Gender Class Members with respect to the statute of limitations on their claims. Therefore, not certifying a class would substantially impair and/or impede the other members' ability to protect their interests.

**Requirements of Rule 23(b)(2)**

110. First Citizens acted on grounds, described herein, generally applicable to Plaintiff and the Gender Class Members, by adopting and following systemic patterns, practices and/or policies that are discriminatory toward Gender Class Tellers, Floaters, and Financial Services & Sales Representatives. These discriminatory acts are fostered by First Citizens' standard patterns, practices and/or policies. They are not sporadic or isolated, and support the request for final injunctive and declaratory relief with respect to Plaintiff and the Gender Class as a whole.

111. Declaratory and injunctive relief flow directly and automatically from proof of the common questions of law and fact regarding the existence of systemic discrimination against Gender Class Members based on their gender.

112. Declaratory and injunctive relief are the factual and legal predicates for Plaintiff's and the Gender Class Members' entitlement to monetary and non-monetary remedies for individual losses caused by, and exemplary purposes necessitated by, such systemic discrimination.

113. Accordingly, injunctive and declaratory relief is among the predominant forms of relief sought in this case.

**Requirements of Rule 23(b)(3)**

114. The common issues of fact and law affecting the Gender Class Representative's claims and those of the Gender Class, including, but not limited to, the common issues identified in the paragraphs above, predominate over issues affecting only individual claims.

115. A class action is superior to other available means for the fair and efficient adjudication of Plaintiff's claims and the claims of the proposed Gender Class.

116. The cost of proving First Citizens' pattern and practice of discrimination makes it impractical for the members of the Gender Class to pursue their claims individually.

117. The class action will not be difficult to manage for reasons including, but not limited to, the discrete organizational nature of all Gender Class Members (they must have worked or be working as Tellers, Floaters and Financial Services & Sales Representatives in First Citizens' South Carolina branch locations), as well as the common questions of law and fact described above.

## COLLECTIVE ACTION ALLEGATIONS
### (Equal Pay Act Claims Against all Defendants)

118. The Fourth Cause of Action is being prosecuted as a collective action pursuant to Section 16(b) of the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 216(b). Plaintiff incorporates by reference the allegations from the preceding paragraphs, including those alleging class-based and common patterns, practices and/or policies by Defendants resulting in unlawful discrimination, as if fully set forth herein.

119.    Plaintiff seeks to maintain claims on her own behalf and on behalf of a collective of female Bank Tellers, Floaters and Financial Services & Sales Representatives who have been, are now or will be employed by Defendants in First Citizens' Charleston South Carolina area branch locations at any time during the applicable liability or statute of limitations periods, up to and including the date of any judgment in this case (the "EPA Collective" or "EPA Collective Members"). This Collective, upon information and belief, consists of more than 50 individuals.

120.    Defendants' systemic discrimination against the EPA Collective based upon gender is described in this Class and Collective Action Complaint and is continuing in nature. The EPA Collective Members were paid less and denied promotions at a greater rate by Defendants than were similarly situated male employees, despite performing similar or the same work and having comparable or better experience and qualifications.

121.    Defendants' discrimination against Plaintiffs and the EPA Collective was the result of Defendants' common patterns, practices and/or policies, and Defendants' acquiescence to and ratification of such patterns, practices and/or policies. The claims of Plaintiff's stated herein are essentially the same as those of the other EPA Collective Members.

122.    The Fourth Cause of Action is properly brought under and maintained as an opt-in collective action pursuant to 29 U.S.C. § 216(b). The EPA Collective is readily ascertainable and the names and addresses of the EPA Collective Members are readily ascertainable from Defendants.

123.   Common questions of law and fact predominate with respect to Plaintiff and the

EPA Collective Members, who are similarly situated as female Bank Tellers, Floaters

and Financial Services & Sales Representatives with substantially similar job duties,

titles, qualifications and working conditions, and were subject to substantially similar

Bank employment patterns, practice and/or policies.

### FIRST CAUSE OF ACTION
**(Violations of Title VII,**
**Individual and Class Action Claims Against First Citizens)**

124.   Plaintiff and the members of the Race Class hereby repeat and re-allege each and

every allegation in all of the preceding paragraphs as if fully set forth herein.

125.   By the actions described above, among others, First Citizens has discriminated

against Plaintiff and the members of the Race and Gender Classes on the basis of their

race and/or color, and gender, in violation of Title VII by denying them the same terms

and conditions of employment available to employees who are white and/or male,

including, but not limited to, permitting a racially hostile work environment that is

continuing in nature, wherein Bank customers have been permitted to threaten and

harass Black and minority Bank employees for over a decade; failing to pay these

employees commensurate with their similarly-situated white male coworkers; failing to

promote or to access applications for higher-paying job openings; disparate working

conditions; and denying them terms and conditions of employment equal to that of

employees who are white and/or male.

126.   As a direct and proximate result of First Citizens' unlawful and discriminatory

conduct in violation of Title VII, Plaintiff and the members of the Race and Gender

Classes have suffered, and continue to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

127.   As a direct and proximate result of First Citizens' unlawful and discriminatory conduct in violation of Title VII, Plaintiff and the members of the Race and Gender Classes have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

128.   First Citizens' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff and the members of the Race Class's and Gender Class's rights under Title VII for which Plaintiff and the members of the Race and Gender Class are entitled to an award of punitive damages.

### SECOND CAUSE OF ACTION
**(Discrimination in Violation of Section 1981,
Individual and Class Action Claims Against all Defendants)**

129.   Plaintiff and the members of the Race Class hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

130.   By the actions described in this Complaint, among others, Defendants have discriminated against Plaintiff and the members of the Race Class on the basis of their race and/or color in violation of Section 1981 by denying them the same terms and conditions of employment available to employees who are white, including, but not limited to permitting a racially hostile work environment that is continuing in nature, wherein Bank customers have been permitted to threaten and harass Black and minority

Bank employees for over a decade; subjecting these employees to disparate working conditions and denying them terms and conditions of employment equal to that of employees who are white.

131.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff and the members of the Race Class have suffered, and continue to suffer, monetary and/or economic harm, including, but not limited to, loss of future income, compensation and benefits for which they are entitled to an award of damages.

132.   As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of Section 1981, Plaintiff and the members of the Race Class have suffered, and continue to suffer, emotional distress for which they are entitled to an award of compensatory damages.

133.   But for Defendants' racial animus against Plaintiff's and the Race Class Members' race, Plaintiff and the Race Class Members would have enjoyed the same terms and conditions as their similarly situated white counterparts.

134.   Defendants' unlawful and discriminatory actions were intentional, done with malice and/or showed a deliberate, willful, wanton and reckless indifference to Plaintiff's and the members of the Race Class's rights under Section 1981 for which Plaintiff and the members of the Race Class are entitled to an award of punitive damages.

### THIRD CAUSE OF ACTION
**(Violations of the Equal Pay Act,**
**Individual and Class Action Claims Against all Defendants)**

135.   Plaintiff and the EPA Collective Members hereby repeat and re-allege each and every allegation in all of the preceding paragraphs as if fully set forth herein.

136.   The claims brought herein under the Equal Pay Act, 29 U.S.C. §206 *et seq*., are brought on behalf of the Plaintiff and all members of the EPA Collective.

137.   During the period of the employment of Plaintiff and all members of the EPA Collective, Defendants were subject to the provisions of the Equal Pay Act, 29 U.S.C. §§ 206 *et seq*. During that time, Defendants required Plaintiff and the members of the EPA Collective to perform the same or substantially the same job position as male employees, requiring equal skill, effort, and responsibility under similar working conditions at the same establishments.

138.   Plaintiff and the members of the EPA Collective receive or received a rate of pay less than such male employees. The differential rate of pay was not part of or occasioned by a seniority system, merit system, a system based on the quantity or quality of production, or upon a factor other than gender.

139.   Defendants engaged in patterns, practices and/or policies of employment which willfully, and in the alternative, unwillfully, discriminated against Plaintiff and the members of the EPA Collective on the basis of their gender and by paying Plaintiff and the EPA Collective Members a lesser rate of pay, including salary and bonus, than that paid to male employees performing the same or substantially similar job duties which

require equal skill, effort, and responsibility, and under the same working conditions and at the same establishments.

140.    By the actions described above, among others, Defendants have violated the Equal Pay Act, 29 U.S.C. §206 *et seq*.

141.    As a direct and proximate result of Defendants' unlawful and discriminatory conduct in violation of the Equal Pay Act, Plaintiff and the EPA Collective Members have suffered, and continue to suffer, harm for which they are entitled to an award of monetary damages and other relief.

142.    Plaintiff and the members of the EPA Collective are further entitled to liquidated damages, reasonable costs and attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff and Collective and Class Members pray that the Court enter judgment in their favor and against Defendants, containing the following relief:

A.    A declaratory judgment that the actions, conduct and practices of Defendants complained of herein violate the laws of the United States;

B.    An injunction and order permanently restraining Defendants from engaging in such unlawful conduct;

C.    Declare this action to be maintainable as a class action pursuant to Fed. R. Civ. P. 23, and direct Defendants to provide Plaintiffs with a list of all members of the Race and Gender Classes, including all last known addresses, telephone numbers and e-mail addresses of each such person, so Plaintiff can give such persons notice of this

action and an opportunity to make an informed decision about whether to participate in it;

D.  Declare this action to be maintainable as a collective action pursuant to 29 U.S.C. §216, and direct Defendants to provide Plaintiff with a list of all members of the EPA Collective, including all last known addresses, telephone numbers and e-mail addresses of each such person, so Plaintiff can give such persons notice of this action and an opportunity to make an informed decision about whether to participate in it;

E.  Designate Plaintiff as representative of her class, and her counsel of record as class counsel;

F.  Determine the damages sustained by Plaintiff and the EPA Collective as a result of Defendants' violations of the EPA, and award those damages against Defendants and in favor of Plaintiff and the EPA Collective, plus such pre-judgment and post-judgment interest as may be allowed by law;

G.  Award Plaintiff and the EPA Collective an additional equal amount as liquidated damages because Defendants' violations were willful and/or without a good faith basis;

H.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and Collective and Class Members for all monetary and/or economic damages, including, but not limited to, loss of past and future income, wages, compensation, seniority, and other benefits of employment;

I.  An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Plaintiff and Collective and Class Members for all non-

monetary and/or compensatory damages, including but not limited to, compensation for their mental anguish, humiliation, embarrassment, stress and anxiety, emotional pain and suffering, emotional distress, harm to their professional and personal reputations, and loss of career fulfillment;

J.    An award of damages for any and all other monetary and/or non-monetary losses suffered by Plaintiff and Collective and Class Members in an amount to be determined at trial, plus prejudgment interest;

K.    An award of punitive damages in an amount to be determined at trial;

L.    An award of costs that Plaintiff and Collective and Class Members have incurred in this action, including, but not limited to, expert witness fees, as well as Plaintiffs' and Collective and Class Members' reasonable attorneys' fees and costs to the fullest extent permitted by law; and

M.    Such other and further relief as the Court may deem just and proper.

## JURY DEMAND

Plaintiff and collective and class members hereby demand a trial by jury on all issues of fact and damages stated herein.

Dated: August 19, 2022                              /s/ Casey M. Martens
                                                    Casey Martens (#12812)
                                                    Molly R. Hamilton Cawley (#11838)
                                                    Kim & Lahey Law Firm, LLC
                                                    3260 Pelham Rd. #213
                                                    Greenville, SC 29615
                                                    (864) 973-6688
                                                    Cmartens@kimandlahey.com

Molly@kimandlahey.com

**POULIN | WILLEY | ANASTOPOULO**
Roy T. Willey, IV (11664)
Paul J. Doolittle (6012)
Blake G. Abbott (13354)
32 Ann Street Charleston, SC 29403
(P): (843) 614-8888
(F): (843) 494-5536
Email: roy@akimlawfirm.com
pauld@akimlawfirm.com
blake@akimlawfirm.com

**ATTORNEYS FOR PLAINTIFF**

## VERIFICATION

I, Casey Martens, declare as follows:

I am an attorney for Plaintiff and have read the forgoing Complaint (FLSA Collective Action and Rule 23 Class Actions) with Jury Demand and know the contents thereof. I am informed and believe that the matters stated therein are true and, on that ground, allege that the matters stated therein are true.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 19th day of August, 2022, at Greenville , South Carolina.

/s/ Casey Martens
Casey Martens